# IN THE COURT OF APPEALS OF IOWA

No. 23-0149
Filed August 21, 2024

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ISAACH OLOYA ANYWAR,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Scott J. Beattie, Judge.

A criminal defendant appeals his conviction for robbery in the first degree.

**AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Josh Irwin, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee.

Considered by Tabor, P.J., and Badding and Buller, J.

**BULLER, Judge.**

"I'm at Prospect Park on the East side of Des Moines and I need an ambulance. My head is bleeding, and I can barely talk right now. I just got robbed." These three sentences, relayed by teenager David W. during a 911 call, summarize the facts here. A police investigation established that Isaach Anywar, Danil Deng, and Mohanad Ishag robbed David. A jury found Anywar guilty of first-degree robbery, and he appeals challenging two evidentiary rulings. We affirm.

## I.  Background Facts and Proceedings

David was hanging out in Des Moines with a few female friends: Halie Poe, Ciciley Gunn, and "Taby."[1]  The group spent time at the downtown skate park before making their way to Union Park. Taby then led the group to meet up with Anywar and two other young men, later identified as Deng and Ishag; Taby had been Snapchatting with Anywar before they met up. Gunn grew uncomfortable when she noticed the trio of men had guns in their waistbands. After introductions, David showed the other men a disassembled .22 caliber rifle in his trunk, which he had planned to shoot at a firing range that day. Both groups then went to Prospect Park.

The young women didn't want to go to Prospect Park. Gunn thought it was "not very safe" and "a lot goes on there." Poe described it as "somewhere where bad things happen. Like, people just do dumb things over there." And Taby didn't want to go because she "knew what was going to happen"—David would "g[e]t jumped" and robbed by Anywar and his compatriots. David told the young women

---

[1] We identify witness "Taby" only by nickname because she was a minor.

he was not worried about going to Prospect Park with Anywar's crew, saying: "No, they're friends, they're homies."

Once they arrived, Taby got out of the car and walked down to the dock with Anywar. The pair returned a few minutes later. David said he was ready to leave, and then—in his words—"things went bad." Anywar's group drew their handguns and surrounded David, Poe, and Gunn, who were inside the vehicle. In Gunn's words:

> [T]hey told David to put the car in park. David just kept saying he was scared. We told David to do what they were telling him to do. He put the car in park. They told him to unlock his phone. They took his phone. They started pressing the gun like against his head, hitting him with it.

David explained at trial that he tried to forget certain parts of the robbery, but he remembered being pistol-whipped. He also explained that the men ordered him out of the car and made him take off his cross necklace, class ring, and all of his clothes. He next recalled:

> I got the guns still pointed at me, and then my—they jumped me, kicked my face, and they told me to unlock the phone so that way I— they could get in it and I didn't have anything, and then they took my wallet and everything else.

David complied with the men's demands, hoping they wouldn't kill him.

While David was on the ground in a state of undress, the men demanded his cell-phone passcode. He provided the code while the men continued to hit him. Before leaving, the men told him: "Don't move, don't get up, stay there." And by the end of the encounter, Anywar and his accomplices had stolen David's rifle, tackle box, jewelry, wallet (including bank cards), and cell phone.

Anywar's group also pointed their guns at the girls during this encounter and told them to leave. So they did. In Gunn's words, they "hauled ass down the street" to get away. And when she "glanced" back, she saw David was "naked, basically" and laying in the grass. In Poe's words: "[T]hey tell me and [Gunn] to get out the car and leave, don't say anything to anyone, don't do anything, don't come and try to help him, there's people that are, like, nearby watching." She also recalled seeing the men hit David with a pistol and that he was on the ground when she looked back. She was "scared" David "was dead." Taby left too, but not before she saw David's "shoes were being thrown into the river. His clothes were being ripped off, and his face was being smashed into the sidewalk." She also saw the men taking the rifle from David's trunk.

A passerby eventually told David the men had left, and David borrowed a phone to call 911. Police and medics responded and found David in "obvious distress" and bleeding from a headwound. Medical professionals diagnosed David with a concussion, and he later explained at trial that he developed post-traumatic stress disorder following the robbery.

Police interviewed the witnesses mentioned above, questioned Anywar, and collected physical and digital evidence. Anywar repeatedly gave false names when questioned; officers were only able to ascertain his real name by running his fingerprints. He admitted to being in Union Park the day David was robbed but denied going to Prospect Park or having anything to do with the robbery. He told officers he was "not with no females at all that day." And he later provided police with falsified digital evidence.

Police obtained geolocation-data from Anywar's Snapchat showing him at Prospect Park during the robbery, with some of that data so specific it showed his movement down to the boat ramp and then back to the parking area—as described by Taby. A Snapchat video recorded on Anywar's phone depicted several seconds of the robbery, and the investigation established Anywar was the videographer based on his distinctive shoes. Cell-phone data also confirmed that Anywar was in Prospect Park at the time of the robbery and placed him at Ishag's and Deng's residences at other points that day, including immediately after the robbery. Data from Ishag's and Deng's phones put them in the same locations. The trio also recorded videos together on the day of the robbery—some with guns and some without. And doorbell surveillance footage showed Deng and Anywar arriving at and leaving a location together in a different vehicle later that night. In addition to this digital evidence, law enforcement recovered David's rifle from Deng's house two days after the robbery.

The Polk County Attorney charged Anywar with one count of robbery in the first degree, a class "B" felony in violation of Iowa Code sections 711.1 and 711.2 (2021), with a weapon enhancement pursuant to section 902.7. While David wasn't able to identify Anywar from a police photo array during the investigation, he, Poe, and Taby all positively identified Anywar as one of the robbers at trial.

A jury found Anywar guilty as charged. He appeals.

## II. Standard of Review

We review most evidentiary rulings for an abuse of discretion. *State v. Dessinger*, 958 N.W.2d 590, 597 (Iowa 2021). But we review the admission of

hearsay for correction of errors at law. *State v. Veverka*, 938 N.W.2d 197, 202 (Iowa 2020).

### III. Discussion

Anywar advances two challenges on appeal, concerning admission of a statement David made to police and surveillance footage.

### A. Hearsay

Anywar objected to hearsay when the assistant county attorney asked a police officer to repeat the description David gave of the robbers:

> Q. Can you describe the identifying information that David provided to you of the defendants?
> . . . .
> A. He described one as 6 feet tall with dreads, and the other two suspects were roughly around 5'8". One he stated was heavyset—

The district court overruled the objection, noting "multiple" rationales supported admitting the evidence. In our review, we discern no error.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Iowa R. Evid. 5.801(c). Here, the prosecutor articulated a non-truth purpose for the evidence—to explain the police officer's responsive course of conduct. This is a well-established non-hearsay purpose for admitting statements from crime victims and witnesses. *See* 7 Laurie Kratky Doré, *Iowa Practice Series: Evidence* § 5.801:4 (West 2023) ("When an out-of-court statement is not offered for its truth, but to explain the responsive conduct of a third party, it is not hearsay."). Anywar does not appear to contest this rationale on appeal and did not file a reply brief addressing this argument by the State. We could affirm on this basis alone. *See* Iowa R. App. P. 6.903(2)(a)(8)(3).

But rather than delve into the merits, we instead conclude any alleged error was harmless because the statement was cumulative. *See State v. Elliott*, 806 N.W.2d 660, 669 (Iowa 2011) (noting trustworthy cumulative hearsay evidence is harmless); *State v. McKettrick*, 480 N.W.2d 52, 60 (Iowa 1992) (same). As pertinent to Anywar, the challenged statement of identification was that he was six-feet tall and had dreadlocks. Taby and Poe gave similar descriptions in their testimony, and they and David all positively identified Anywar at trial. On cross-examination, Anywar's own attorney read into the record portions of a police report specifying David told an officer about "a tall suspect with dreads." These cumulative statements, all admitted without objection or affirmatively elicited by the defense, render any arguable error harmless. *See State v. Newell*, 710 N.W.2d 6, 19 (Iowa 2006) ("[E]rroneously admitted hearsay will not be considered prejudicial if substantially the same evidence is properly in the record.").

### B. Surveillance Footage

Anywar also objected to the admission of silent surveillance footage showing he and Deng exited a vehicle, walked off-screen from the camera's viewpoint, then ran back to their car a few minutes later and drove off. The surveillance footage apparently surfaced in connection with a murder investigation where Anywar and his accomplices were the primary suspects—and the original recording had audio with gunshots. Anywar conceded most of video was admissible to show him wearing clothing consistent with the time of the robbery and that he was with Deng that day instead of alone (as he told police). But Anywar sought exclusion of the portion of the video that showed him and Deng running

back to the car and driving off as irrelevant, immaterial, unfairly prejudicial, and

improper character evidence.

The court gave a fairly detailed explanation when it overruled the objection:

> The Court has looked at the exhibit. In particular, the portion of the exhibit—again, make sure it's clear for the record. It's really the latter half of this video that's in question. The first half of the video really isn't at issue because it only depicts the defendant and Mr. Deng or the alleged individuals getting out of the car and walking away. Certainly that's relevant, as the State has noted, for the purposes noted. It's really only the second half that arguably could be prejudicial.
>
> The Court, after reviewing that second half of the video, does not believe that it's unduly prejudicial pursuant to 403. Specifically, while the individuals are running back to the car, quite frankly, they're not running as if they're running away from anything, and they sit in the car for a moment before they even leave. They leave at not a horribly accelerated pace. I don't think there's a highly or any real significant prejudicial effect of that. Again, the jury in this case has no knowledge of any allegations or investigations of murder. That was excluded by the Court in its previous motion in limine.
>
> As such, I'm going to allow the video as proposed by the State. Again, that is the video that is void of any sound that would indicate any gunshots fired in the area.

The defense raised the issue again later in the trial by motion for mistrial,

and the district court again gave a detailed explanation of its ruling:

> Let me, in responding and ruling on the matter, make something very, very clear for purposes of the record. First and foremost, the court has gone to great lengths in this case to ensure not only the evidence of that separate murder investigation was not presented to this jury, but any other inference of any other investigation concerning any other crime would be presented to this jury.
>
> I don't believe any evidence or inference has been made to this jury. As such, this court—or this jury, rather, has no context in which to put any—or, rather, to put the video of the defendant, or the individual that purports to be the defendant, running to his vehicle. They have no ability to put it in context of another crime. As such, the piece of evidence before the jury is a—simply a video of an individual running to a car without any other implication.
>
> As such, there is no, in the court's mind, unfair prejudice of that video, and under a 403 balancing analysis, there is relevance

because it shows place and time and identity of the defendant. When balanced, it is not substantially outweighed by the unfair prejudice.

As a result, the court stands by its previous ruling that it is relevant, and it should not be excluded under 403. The court understands that this motion for mistrial is based upon that previous ruling. Because the court believes that the previous ruling is correct, there is no undue prejudice or unfair prejudice, the court denies the motion for mistrial.

On appeal, Anywar contends the probative value of the video was outweighed by a "high danger" of unfair prejudice. The State emphasizes the probative value of the video in establishing that Anywar was with Deng an hour after the robbery, Anywar lied to police, and Anywar was wearing the same distinctive clothing seen in the Snapchat recording of the robbery.

Under Iowa Rule of Evidence 5.403, a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Unfairly prejudicial evidence "prompts the jury to make a decision on an improper basis." *State v. Liggins*, 978 N.W.2d 406, 422 (Iowa 2022). We recognize balancing under Rule 5.403 can be more art than science, and we do not discern an abuse of discretion on this record. We reproduced the district court's comments above in part to show the court engaged in the proper balancing analysis and did so thoughtfully to ensure the jury did not use the video evidence for any improper purpose. While perhaps reasonable jurists could have exercised their discretion differently, Anywar cannot demonstrate an abuse of discretion by the district court.

**AFFIRMED.**